Xhavin Sinha (SBN 309340)
SINHA LAW
3901 Lick Mill Blvd., Suite 356
Santa Clara, CA 95054
Telephone:  (408) 791-0432
Email:  xsinha@sinha-law.com

Attorney for Plaintiff
PACIFIC ENVIRONMENTAL ADVOCATES

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC ENVIRONMENTAL ADVOCATES, LLC, a California limited liability company,<br><br>          Plaintiff,<br><br>   vs.<br><br>CAL-COAST MFG., INC, a California corporation; LONNIE BAPTISTA, an individual; SHANNON BAPTISTA, an individual; and DOES 1-10, inclusive,<br><br>          Defendant. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff PACIFIC ENVIRONMENTAL ADVOCATES, LLC ("PEA") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## I.   INTRODUCTION

1.   This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants CAL-COAST MFG., INC., LONNIE BAPTISTA and SHANNON BAPTISTA ("Defendants") for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

COMPLAINT – Page 1

**Notice Letter**

2.      On or about May 13, 2024 PEA provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to the Facility Manager/Chief Executive Officer/Owner/Agent  for Service of Process Lonnie Baptista of Defendant Cal-Coast Mfg. Inc., by certified mail, at 424 South Tegner Road, Turlock, California ("the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      On or about June 22, 2024, PEA provided a First Amended Notice of  Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to the Facility Manager/Chief Executive Officer/Owner/Agent  for Service of Process Lonnie Baptista of Defendant Cal-Coast Mfg. Inc., by mail, and electronic mail to the Facility.

4.      A copy of PEA's Notice of Intent to Sue, and First Amended Notice of Intent to Sue (collectively "Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

5.      More than sixty days have passed since PEA's Notice was properly and lawfully served on Defendant, the State Board, and the Regional and National EPA Administrators.  PEA is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II.    PARTIES

**Plaintiff**

6.    Plaintiff PACIFIC ENVIRONMENTAL ADVOCATES, LLC ("PEA") is an environmental membership group organized under the laws of the State of California.

**Defendants**

7.    PEA is informed and believes, and on such information and belief alleges, that Defendant CAL-COAST MFG., INC., with its principal place of business located at 424 S. Tegner Road, in Turlock, California, is a for-profit corporation formed in California on or around January 1, 1981, in good standing with the California Secretary of State. This is attached hereto as **Exhibit B**.

8.    PEA is informed and believes, and on such information and belief alleges, that as of the date of the filing of this complaint, Defendant CAL-COAST MFG., INC., has failed to submit a Notice of Intent to discharge (NOI) and, apply for General Permit coverage to discharge stormwater according to records on file with the Central Valley Regional Water Quality Control Board and the State Water Resources Control Board ("Water Board").

9.    PEA is informed and believes, and on such information and belief alleges that Defendant CAL-COAST MFG., INC., is and has been continuously the operator of the Facility.

10.    PEA is informed and believes, and on such information and belief alleges that Defendant LONNIE BAPTISTA is the Chief Operating Officer for the Facility.   Defendant LONNIE BAPTISTA is also listed as the property owner.

11.    PEA is informed and believes, and on such information and belief alleges that Defendant SHANNON BAPTISTA is listed as the property owner for the Facility with Defendant LONNIE BAPTISTA.

### III.  JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

12.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

13.  The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016))

14.  By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A)

15.  Venue is proper because Defendants reside in and the events or omissions giving rise to PEA's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

### IV.  ARTICLE III STANDING

16.  PEA's organizational purpose is the protection, preservation and enhancement of the rivers, creeks, streams, lakes and oceans (and their tributaries) located in California.

17.  PEA's organizational purpose and mission is accomplished through enforcement of the provisions of the Federal Clean Water Act and California's Industrial General Permit, in seeking redress against Industrial Dischargers who violate the Clean Water Act by failing to

comply with all standard conditions of the Industrial General Permit.  These standard conditions include, but are not limited to, discharges of polluted stormwater in violation of Federal and California criteria, deficient Stormwater Pollution Prevention Plans and Site Maps, deficient stormwater monitoring and sampling programs/protocols and reporting, deficient best management practices, deficient or non-existing exceedance response action reports, deficient or non-existing employee stormwater training programs, deficient or non-existing annual reports and other informational deficiencies.

18.    PEA's associational members volunteer their resources to join PEA's organizational purpose and mission.

19.    PEA has associational members throughout Northern California.  Some of PEA's members reside, work and/or recreate near the Tuolumne River, and the San Joaquin River, a tributary of the Sacramento-San Joaquin River Delta Waterways (the "Receiving Waters" for Defendant's storm water run-off), and use those waters and their watersheds for kayaking, canoeing, camping, cycling, recreation, sports, fishing, swimming, hiking, bird watching, photography, nature walks and scientific study.  Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendant's failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

20.    PEA has Article III standing as an association to bring this suit against Defendant, as at least one of PEA's current members is experiencing an ongoing, concrete and particularized injury fairly traceable to Defendant's violations of the Clean Water Act and Industrial General Permit, which likely can be redressed by a judicial decision granting PEA the injunctive relief requested herein.

21.     The aesthetic and recreational interests of the individual associational members of PEA with Article III standing have been adversely impacted by Defendant's failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act, as delineated herein.

22.     In addition to harming the aesthetic and recreational interests of PEA's members with standing in this matter, Defendant's procedural violations of the standard conditions of California's Industrial General Permit have caused informational injuries to PEA's standing members by depriving these members of their substantive constitutional and statutory rights to obtain information regarding Defendant's compliance with standard conditions of California's Industrial General Permit as delineated herein, which provisions have been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

23.     PEA's associational members who qualify for standing in this matter are current members who have been members of PEA since at least the date that PEA provided to Defendant the 60-day Notice of Intent to Sue attached hereto as **Exhibit A**.

24.     Defendant's ongoing violations of the General Permit and the Clean Water Act have and will continue to cause irreparable harm to PEA and its current standing members.

25.     The relief requested herein will redress the ongoing injury in fact to PEA and its members.

26.     Neither litigation of the claims asserted, nor the relief requested in this Complaint, will require the participation in this lawsuit of any individual members of PEA.

**Specific Standing Allegations**

27.     One of Plaintiff's associational members with the Article III has the initials DB, and identifies as an adult female with the pronouns she/her/hers.

28.     DB is a current member of PEA who has been an associational member of PEA continuously since the association officially incorporated in January 2024 and even before when the group was not incorporated in 2023.

29.     DB has regularly recreated in and around the area of the Tuolumne River and the San Joaquin River near the Facility, for at least the five years preceding this lawsuit.

30.     Furthermore, DB plans to return to these and other areas near the Tuolumne River and the San Joaquin River and its tributaries (which are the Receiving Waters for Defendants' facility polluted storm water runoff) to recreate, take the family, visit friends and view wildlife.

31.     DB is an avid hiker and swimmer.

32.     Every year DB visits family and friends in the area. DB grew up around this area and has seen the water quality get worse and worse each year.

33.     DB has visited the shops and restaurants in the town of Turlock and has enjoyed recreational walks, viewing the wildlife, and outdoor photography near the Facility, Tuolumne River and the San Joaquin River among other tributaries in the area.

34.     DB has visited Defendants' facility and has personally observed the alarming lack of housekeeping practices ongoing at the Facility, including metal and plastic wastes around the facility. Metal items at the Facility rusting and leeching metals into the ground water. This was observed during a rain event.

35.     It was also observed an enormous amount of industrial materials stored outdoors without cover, pooled storm water onsite coming with rusting residues and other chemical and plastic materials and residues. In addition, there were unmitigated amounts of junk, plastic debris, trash and other debris. The fence at the facility boundary is also in bad condition.

36.     DB has viewed the images in this Complaint and has either participated in collecting those images or has been present when the images were taken.

37.     DB is familiar with the requirements of the General Permit and the operation of industrial businesses.

38.     DB is aware that Defendants do not have a Permit to discharge stormwater, and further have not taken steps to ensure that stormwater is not polluted when it is discharged from the facility.

39.     DB is aware that the chemicals and industrial materials handled at Defendants facility include heavy metals, including Iron based on visual observations, and which she believes are entering the Tuolumne River and the San Joaquin River and its tributaries after they commingle with storm water runoff and leave the Facility's boundaries, are extremely toxic to both humans and aquatic life.

40.     DB is aware that Defendants do not have a Permit to discharge stormwater, and further have not taken steps to ensure that stormwater is not polluted when it is discharged from the facility.

41.     DB is aware that the chemicals and industrial materials handled at Defendants facility include heavy metals, including Iron based on visual observations, and which she believes are entering the Tuolumne River and the San Joaquin River and its tributaries after they commingle with storm water runoff and leave the Facility's boundaries, are extremely toxic to both humans and aquatic life.

42.     DB is aware that the chemicals and industrial materials handled at Defendants facility include heavy metals, including Iron based on visual observations, and which she believes are entering the Tuolumne River and the San Joaquin River and its tributaries after they commingle

with storm water runoff and leave the Facility's boundaries, are extremely toxic to both humans and aquatic life.

43.     DB believes that the pollutants associated with Defendants' facility which leave the boundaries of the Facility during every storm event are degrading the Facility's direct Receiving Waters, Tuolumne River and the San Joaquin River, both of which are within close proximity to the Facility, and which connect to the Sacramento River.

44.     As such, DB is hesitant to utilize, and even have her family utilize the Tuolumne River and the San Joaquin River and its tributaries and is concerned about the pollution entering the Tuolumne River and the San Joaquin River which DB believes is emanating directly from Defendants' facility.

45.     The Tuolumne River and the San Joaquin River is home to fish species such as the chinook salmon, rainbow trout and steelhead trout.

46.     In the past, DB has engaged in hiking, and water sports in and around the Tuolumne River and the San Joaquin River during visits in the spring and summer.

47.     However, due to DB's concerns related to the pollution continuing to emanate from the boundaries of Defendants' facility and entering the San Joaquin River, by way of Tuolumne River, DB has ceased all water sport activities by her and her family in the waterways and tributaries of the San Joaquin River.

48.     DB observed the General Permit violations occurring at the Facility prior to the date that Plaintiff issued its Notice Letter to Defendants on June 22, 2024.

49.     DB no longer feels safe consuming any fish from the Tuolumne River and the San

Joaquin River or its tributaries, due to the contamination of the Tuolumne River and the San Joaquin River and its tributaries caused by the heavy-metals and continuing pollution emanating from Defendants' facility.

50.    DB is continuously appalled and emotionally outraged by Defendants' blatant refusal to do any best management practices (BMPs), obtain a General Permit, and then follow the requirements of the General Permit, which she believes has directly degraded the Tuolumne River and the San Joaquin River and its tributaries near the Facility around which DB has been recreating and plans to continue to recreate.

51.    DB is concerned about Defendants' willful General Permit violations which are occurring at the Facility on an ongoing basis and how those violations have caused and contributed to degraded water quality in the Tuolumne River and the San Joaquin River and its tributaries which DB utilized on a regular basis when visiting the area.

52.    DB has also observed dirty, smelly water in those areas and is concerned that her and her family's health may have been damaged by Defendants' intentional violations of mandatory environmental laws.

53.    Based on the foregoing, DB has suffered and will continue to suffer emotional, aesthetic, and recreational injuries-in-fact directly associated with the CWA and General Permit violations Plaintiff alleges are being committed on an ongoing and continuous basis by Defendants.

54.    DB's injuries can be adequately redressed by the injunctive relief requested herein.

## V.    STATUTORY BACKGROUND

55.    Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

56.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

57.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

58.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board ("Water Board") to issue NPDES permits, including general NPDES permits in California.

General Permit

59.    The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April

17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015. The 2015 Permit went into effect on July 1, 2015. The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

60.     On November 16, 2018, the State Water Board adopted a revised General Permit (Order No. 2018-0028-DWQ, which technically became effective on July 1, 2020. However, the 2018 Revisions have not officially been finalized or certified by the Clerk of the State Water Board as of the date of this Complaint.

61.     In order to discharge storm water lawfully in California, all industrial facilities discharging, or having the potential to discharge, storm water associated with industrial activity ("Dischargers") which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

62.     The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

63.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

64.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

65.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that Dischargers must meet.

66.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

67.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

68.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet §I(1).

69.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a

list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

70.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

71.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, § X(H)(4), (5).

72.     The General Permit requires Dischargers to develop and implement an adequate written Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

73.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

74.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each

reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

75. A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area. General Permit §XI(B)(2)

76. Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report. General Permit § XI(B)(4)

77. Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. General Permit, § XI(A)

78. The General Permit requires operators to conduct an Annual Comprehensive facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

79. Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. General Permit, § XI(B)(6)(c).

80.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

81.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

82.     The following annual NALs have been established under the General Permit for pollution parameters applicable to all Dischargers: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; iron – 1.0 mg/L, nitrite + nitrate as nitrogen --.68 mg/L, zinc --.26 mg/L, phosphorus --2.0 mg/L, aluminum – .75 mg/L, lead – .262 mg/L, copper – .0332 mg/L, nickel – 1.02 mg/L and chemical oxygen demand – 120 mg/L.

83.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A)

84.     When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an

applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." General Permit § XII(C)

85.     For Level 2 Status, a Discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit §XII(D)

86.     The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS"). SMARTS is a platform where Dischargers, regulators, and the public can enter, manage, and view storm water data associated with General Permit compliance.

87.     The General Permit requires Dischargers to upload to SMARTS all Permit Registration Documents, including SWPPPs and Site Maps, monitoring and sampling data and Annual Reports.

88.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

89.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the facility, with the following certification:

> "I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false

information, including the possibility of fine and imprisonment for knowing violations."

90.    Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both.  *See also* Clean Water Act section 309(c)(4).

Central Valley Region Basin Plan

91.    The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," generally referred to as the Basin Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

92.    The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

93.    The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

94.     The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

95.     The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

96.     The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

97.     The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

98.     The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

99.     Title 22 of the California Code of Regulations provides a MCL for aluminum of 1.0 mg/L, for Cadmium of .01 mg/L, and lead of .05 mg/L.

100.    The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

101.    The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

102.    Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L.

Citizen Suit Provision of the CWA

103.    Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

104.    In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d). 33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, and $56,460.00 per day per violation for violations occurring after November 2, 2015.  33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

105.    Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## VI.    FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

106.    Defendant Cal-Coast Mfg is a facility that designs, engineers and manufactures fabricated metal building projects.  PEA is informed and believes that the facility falls under standard industrial classification ("SIC") code 3448.

107.    PEA is informed and believes that Defendant Cal-Coast Mfg stores industrial materials outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

108.    Plaintiff is informed and believes, and thereupon alleges that during rain events, storm water flows over the surface of the facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground.   Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the facility's storm water channels.

109.    PEA is informed and believes that Cal-Coast Mfg., Inc., stores industrial materials outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed. Figure 1 shows a photo of the site taken on May 28, 2024, depicting some materials stored outdoors and exposed to rainwater.



Figure 1. Backyard area of Cal-Coast Mfg., Inc.'s Facility showing junk improperly stored outdoors exposed to rainwater.

110.     Based on PEA's investigation, including a review of the Defendant's facility, observations of the facility, review of California's General Permit requirements, study of the stormwater and ground water in the area, Federal, State and local regulatory agency mapping tools and PEA's information and belief, storm water leaves the boundaries of Defendant's facility and enters before reaching San Joaquin River, a navigable Water of the United States.

111.     Plaintiff is informed and believes, and thereupon alleges, that the best management practices at the facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

112.     Figure 2 shows examples of litter around the site.



Figure 2. Site Visit September 10, 2024 showing litter on site, spilled material that is exposed to rain.

113.    Figure 3 shows an example of metal placement around the facility. Metal pieces looked rusted.



Figure 3. Examples of rusted metal pipes lying uncovered around the facility. Site visit on September 10, 2024.

Deficient SWPPP/Failure to Follow SWPPP

114.    On information and belief, Plaintiff alleges that since at least May 1, 2019, Defendant has failed to implement an adequate SWPPP for its facility.

115.    Plaintiff is informed and believes, and thereupon alleges, that Defendants do not have a SWPPP and as a result, the SWPPP and Site Map do not include each of the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

116.    Plaintiff is informed and believes, and thereupon alleges, that Defendants do not have a SWPPP and Site Map which do not include sufficient information to comply with the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

117.    Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP does not set forth site-specific Best Management Practices (BMPs) for the facility that are consistent with BAT or BCT.

118.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the facility's SWPPP and site-specific BMPs consistent with the General Permit.

119.    In addition, Plaintiff alleges that Defendant has failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting.

120.    Information available to PEA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the San Joaquin River.

121.    Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendant's deficient SWPPP are ongoing and continuing.

Monitoring and Reporting

122.    On information and belief, PEA alleges that Defendant has an inadequate monitoring program at its facility.

123.    On information and belief, PEA alleges that since May 1, 2019, Defendant has failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

124.    On information and belief, PEA alleges that Defendant has failed to conduct monthly visual observations of storm water discharges at the facility since at least May 1, 2019.

125.    On information and belief, PEA alleges that Defendant has failed to collect storm water samples from each drainage area at all discharge locations at its facility, for each QSE where sampling is performed, pursuant to General Permit § XI(B), as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

126.    PEA is informed and believes that Defendant has failed to analyze the facility's storm water samples for the required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

127.    On information and belief, PEA alleges that Defendant has failed to deliver the facility storm water samples to a qualified Laboratory within 48 hours of collection, pursuant to Attachment H, Section 2 of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

128.    PEA is informed and believes that Defendant has failed to upload facility storm water sample analyses within 30 days of obtaining the results of the sampling event, in violation of Section XI(B)(11) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

129.    PEA is informed and believes that Defendant has failed to properly analyze its collected storm water sample for the parameter of pH, in violation of Section XI(C)(2)(a) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

Failure to File Annual Reports

130.    PEA is informed and believes that since May 1, 2019, Defendant has failed to file any Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI(L)

and XXI(N) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

<u>Failure to Implement BAT/BCT and BMPs</u>

131.    PEA is informed and believes that since at least May 1, 2019, Defendant has failed to identify and implement Best Management Practices ("BMPs") at its facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit §§ I(C), V(A).

132.    Defendant's BMP deficiencies are more particularly described in the Notice Letter attached hereto as **Exhibit A**.

133.    Information available to PEA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the facility to the San Joaquin River.

<u>Discharges of Contaminated Storm Water</u>

134.    Defendant Cal-Coast Mfg has not collected and analyzed any storm water run-off since it first began operations at the facility.

135.    Information available to PEA indicates that unauthorized non-storm water discharges occur at the facility due to inadequate BMP development and/or implementation necessary to prevent these discharges, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

136.     Due to the nature of the operations at the facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendant Cal-Coast Mfg is discharging storm water containing excessive levels of pollutants specific to its operation during at least every significant local rain event.

Failure to Train Employees

137.     The General Permit requires all Dischargers to designate a Legally Responsible Person to implement the requirements of the Permit.   The Legally Responsible Person is responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

138.     Plaintiff is informed and believes that since at least May 1, 2019, Defendant Cal-Coast Mfg has failed to implement and train a Pollution Prevention Team at its facility.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

139.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

140.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

141.     As outlined herein, Defendant has failed to develop and implement an adequate SWPPP for its facility.

142.     Each day since May 1, 2019 that Defendant has failed to develop, implement and update an adequate SWPPP for the facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

## SECOND CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

143.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

144.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

145.    As outlined herein, Defendant has failed to develop and implement an adequate monitoring and reporting program for its facility.

146.    Each day since at least May 1, 2019, that Defendant has failed to develop and implement an adequate monitoring and reporting program for its facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## THIRD CAUSE OF ACTION
### Submission of Annual Reports to the Regional Water Board
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

147.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

148.    Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information.

149.    As delineated herein, Defendant Cal-Coast Mfg has failed to file any of the facility's Annual Report(s).

150.     Each time since May 1, 2019 that Defendant has failed to file an Annual Report is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### FOURTH CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

151.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

152.     The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

153.     As alleged herein, Defendant has failed to implement BAT and BCT at the facility for its discharges of pollutants, in violation of Effluent Limitation V(A) of the General Permit.

154.     Each day since at least May 1, 2019 that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### FIFTH CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

155.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

156.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

157.    Plaintiff is informed and believes, and thereupon alleges, that since at least May 1, 2019, Defendant Cal-Coast Mfg has been discharging polluted storm water from its facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

158.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at both facilities, becoming contaminated with pollutants associated with the industrial activity occurring at Defendant's facility.   The polluted storm water then flows untreated into the San Joaquin River.

159.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

160.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

161.   Every day since at least May 1, 2019 that Defendant has discharged and continues to discharge polluted storm water from its facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### SIXTH CAUSE OF ACTION
**Discharge of Contaminated Storm Water Without NPDES Authorization in Violation of the CWA, 33 U.S.C. §§ 1311(a)**
**(Violations of the Permit and the Act, 33 U.S.C. §§ 1311, 1342)**

162.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

163.   CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless authorized by the terms of an NPDES permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

164.   Plaintiffs plead that Defendant Cal-Coast Mfg., Inc., does not have NPDES permit authorization for storm water discharges from the Facility into waters of the United States. As herein alleged, Defendant Cal-Coast Mfg has failed to date to obtain a permit to discharge stormwater.

165.   Since it commenced operations at the Facility, Cal-Coast Mfg., Inc. has been discharging polluted storm water from the Facility without NPDES permit authorization during every significant rain event (i.e., all rainfall events generating 0.1 inches or more of rain) in violation of CWA section 301(a), 33 U.S.C. § 1311(a). In particular, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with iron, sediment, and other potentially un-monitored pollutants. The storm water then flows untreated into the Tuolumne River and the San Joaquin River.

166.     Defendant Cal-Coast Mfg., Inc., will continue to be in violation of CWA section 301(a)'s discharge prohibition each day it discharges storm water from the Facility without obtaining an NPDES permit.

167.     Cal-Coast Mfg., Inc., is liable for civil penalties for each discharge of polluted stormwater into the Tuolumne River and the San Joaquin River since five years and 60 days prior to the filing of this action. 33 U.S.C. § 1365(a), 33 U.S.C. § 1319(d). These violations are ongoing and continuous.

## SEVENTH CAUSE OF ACTION
**Failure to Properly Train facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

168.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

169.     Section X(D)(1) of the General Permit requires each facility to establish a Pollution Prevention Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

170.     Section X(H)(f) of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained.

171.     Since at least May 1, 2019, Defendant has failed to properly implement and train a Pollution Prevention Team, which has resulted in the General Permit violations alleged herein. These violations are ongoing and continuous.

## EIGHTH CAUSE OF ACTION
### (Recovery Under the Catalyst Theory CCP §1021.5)

172.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

173.     Under the substantive law of California, if a plaintiff is a catalyst in encouraging a Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and costs.  *Graham v. DaimlerChrysler Corp*., 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553 (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal.Dec. 2, 2004), 34 Cal.4th 604, 21 Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

174.     A requirement for recovery under the catalyst theory is that a plaintiff first advise the Defendant of the claim and provide an opportunity to resolve the matter.  The Plaintiff in this case complied by providing both the catalyst and the written notice of the claim to Defendants prior to suit.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.     Declare Defendant to have violated and to be in violation of the CWA;

2.     Issue and injunction ordering Defendant to immediately obtain a Permit to discharge stormwater;

3.     Issue an injunction ordering Defendant to immediately operate its facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

4.      Enjoin Defendant Cal-Coast Mfg from discharging pollutants to the ground and surface waters surrounding its facility until such time as Defendant has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

5.      Order Defendant to pay civil penalties of $56,460.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

6.      Order Defendant Cal-Coast Mfg to take appropriate actions to restore the quality of United States waters impaired by activities at its facility;

7.      Order Defendant to pay PEA's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

8.      Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendant's voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendant undertook any such corrective action after receiving Plaintiff's Notice, and;

9.      Award such other and further relief as may be just and proper.


Dated:  November 11, 2024                    Respectfully,


                                             By: _____
                                                 Xhavin Sinha
                                                 Attorney for Plaintiff

# EXHIBIT A



June 22, 2024

<u>Via US Mail, Certified</u>

Lonnie Baptista
Cal-Coast Mfg
424 South Tegner Road
Turlock, CA 95380

<u>Via US Mail</u>

Lonnie Baptista
Cal-Coast Mfg., Inc.
PO Box 1864
Turlock, CA  95381

Baptista Lonnie L & Shannon West Trs
c/o Baptista 2013 Trust
2301 N Berkley Ave
Turlock, CA 95382-2140

**Re:** **First Amended 60-Day Notice of Violations and Intent to File Suit Under the
Federal Water Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Cal-Coast Mfg., Inc.:

This letter is being sent to you by Pacific Environmental Advocates ("PEA") about potential non-compliance with the Clean Water Act (CWA) and California's Industrial Stormwater General Permit ("IGP") at 424 South Tegner Road in Turlock, California operated by Cal-Coast Manufacturing. It is our understanding that there may be violations that affect water quality and could potentially harm environmental and public health.

As advocates for environmental protection, one of our primary goals is to ensure compliance with environmental laws and to protect our natural resources. We believe in working collaboratively to address and resolve environmental issues and are committed to finding a constructive path forward.

---

This letter is being sent to you on behalf of Pacific Environmental Advocates, LLC ("PEA") to give legal notice that PEA intends to file a civil action against Cal-Coast Mfg., Inc. ("Discharger" or "Cal-Coast Mfg") and its corporate officers and other legally responsible parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that PEA believes are occurring at the Cal-Coast Mfg facility located at 424 South Tegner Road in Turlock, California ("the Facility" or "the site").

This letter serves as a formal Notice of Intent to Sue, as required by Section 505(b) of the CWA. This notification is not a reflection of adversarial intent but a legal step we must take to comply with the procedures laid out in the CWA. The purpose of this notice is to inform you of the alleged violations and to provide an opportunity for you to address and correct the alleged issues.

PEA is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below.  PEA has members throughout California.  Some of PEA's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of PEA's current members has standing to bring suit against Cal-Coast Mfg, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific PEA member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous.  As a result, the interests of certain individual PEA members have been, are being, and will continue to be adversely affected by the failure of Cal-Coast Mfg to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility.  After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, PEA reserves the right to file suit in federal court against Cal-Coast Mfg under

CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.      THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

PEA's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-0028-DWQ) (hereinafter "General Permit").

Information available to PEA, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that Cal-Coast Mfg has to date failed to submit a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit.

As more fully described in Section III, below, PEA alleges that in its operations of the Facility, Cal-Coast Mfg has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  The Facility

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Cal-Coast Mfg's permanent facility address of 424 South Tegner Road in Turlock, California.

Cal-Coast Mfg is a facility that designs, engineers and manufactures fabricated metal building projects. Facility operations fall under Standard Industrial Classification Code(s) (SIC) 3448 – Prefabricated metal buildings. Cal-Coast Mfg's SIC Code(s) and facility operations require it to apply for coverage under the General Permit, pursuant to Attachment A of the General Permit.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 3448, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids, and various types of oil and grease, as well as zinc, nitrates and nitrites as nitrogen (N+N), iron and aluminum.

Information available to PEA indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

## B.   <u>The Affected Receiving Waters</u>

The Facility discharges into the City of Turlock municipal storm drain system via facility surface inlets and sheet flow out of the west (front) of the facility (Tegner Road). Stormwater then flows south and west of the facility to the Harding Drain, which has a direct connection to the San Joaquin River ("Receiving Waters"). The San Joaquin River and the Harding Drain are impaired for Boron, Group A Pesticides, Chlorpyrifos, Diazinon, Dieldrin, Dimethoate, Diuron, E.Coli, HCB, gamma-HCH, Malathion, Mercury, Zinphos-mehtyl, alpha-BHC, cis-permethrin, Simazine, Electrical Conductivity, Temperature, DDD, DDE, and DDT.

The San Joaquin River is a water of the United States. The CWA requires that water bodies such as the San Joaquin River meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants. Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

## III.   VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A.   <u>Failure to Apply For NPDES Coverage</u>

The CWA prohibits storm water discharges without a permit. 33 U.S.C. § 1342; 40 C.F.R. § 122.26. The General Permit regulates operators of facilities subject to coverage under the National Pollutant Discharge Elimination System (NPDES) storm water permit, as these operators discharge storm water associated with specific industrial activities identified by both

industrial activity and SIC (Standard Industrial Classification) codes in Attachment A of the Permit.

Cal-Coast Mfg's primary industrial activity is listed on Attachment A as an industrial activity subject to NPDES coverage. Thus, the Facility was required to apply for coverage under the Permit in order to commence business operations, pursuant to Section I.Q of the Permit.

According to California Secretary of State records, Cal-Coast Mfg commenced its operations at the site on or before July 1, 2015 but has failed to date to apply for coverage under the General Permit.

### B.  *Failure to Develop and Implement a SWPPP and Site Map*

Cal-Coast Mfg has also failed to develop and implement either a Storm Water Pollution Prevention Plan ("SWPPP") or Site Map for the Facility.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### C.  *Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit*

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1.  Failure to Conduct Visual Observations

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants. Dischargers must

document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges.

PEA alleges that Cal-Coast Mfg has failed to conduct the required visual observations since May 1, 2019.

2. Failure to Collect and Analyze the Required Number of Storm Water Samples

In addition, PEA alleges that Cal-Coast Mfg has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

As of the date of this Notice, Cal-Coast Mfg has failed to upload into the SMARTS database system any facility storm water run-off sample analyses.

### D. *Failure to File Annual Reports*

Cal-Coast Mfg has failed to comply with Section XVI.A of the General Permit, which provides as follows: "The Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS."

To date, Cal-Coast Mfg has failed to file Annual Reports for the reporting years 2018-2019, 2019-2020, 2020-2021, 2021-2022 and 2022-2023.

### E. *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.



Figure 1. Metal rusting in yard exposed to stormwater.

PEA alleges that Cal-Coast Mfg has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges.  Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Cal-Coast Mfg's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

### F.   *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States.  Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to PEA indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

PEA alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

PEA hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and

distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### G. *Failure to Comply with the Mandates of the Regional Water Board*

Pursuant to Section XIX.B of the General Permit, Regional Water Boards have general authority to enforce the provisions and requirements of the General Permit, including reviewing SWPPPs, Monitoring Implementation Plans, ERA Reports, and Annual Reports and requiring Dischargers to revise and re-submit PRDs, conducting compliance inspections, and taking enforcement actions.

As of the date of this Notice, Cal-Coast Mfg has failed to comply with mandates of the Regional Water Board that it apply for General Permit coverage.

### H. *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.   Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

As of the date of this Notice, Cal-Coast Mfg has failed to establish and train a Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Cal-Coast Mfg may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, PEA includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

## IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Cal-Coast Mfg., Inc., as well as its corporate officers and employees of the Facility responsible for compliance with the CWA.

**V.     THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS**

The range of dates covered by this 60-day Notice is May 1, 2019, to the date of this Notice. PEA may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

**VI.     CONTACT INFORMATION**

The entity giving this 60-day Notice is Pacific Environmental Advocates, LLC ("PEA").

Darcie Barnes
PACIFIC ENVIRONMENTAL ADVOCATES, LLC
1275 4th Street #4096
Santa Rosa, CA  95404
Telephone: 707-536-1874
Email: solutions@pacificenvironmentaladvocates.com

To ensure proper response to this Notice, all communications should be addressed to PEA's Counsel, Mr. Xhavin Sinha.

Xhavin Sinha
Sinha Law
3901 Lick Mill Boulevard, Suite 356
Santa Clara, CA 95054
Telephone: (408) 791-0432
Email: xsinha@sinha-law.com

**IV.     RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT**

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of $56,460.00 per day, for each violation occurring on or after November 2, 2015.**

In addition to civil penalties, PEA will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to 33 U.S.C. § 1365(d), PEA will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred in this matter.

## V.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. PEA encourages Cal-Coast Mfg Inc.'s counsel to contact PEA's counsel within 20 days of receipt of this Notice to initiate a discussion regarding the violations detailed herein and to determine how Cal-Coast Mfg. Inc. may resolve this matter without the necessity of litigation.

During the 60-day notice period, PEA is willing to discuss effective remedies for the violations; however, if Cal-Coast Mfg. wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If PEA does not receive a response from Cal-Coast Mfg. Inc. or its counsel before the expiration of the 60-day notice period, PEA will consider legal action to ensure compliance.  Thank you.

Sincerely,

Darcie Barnes
PACIFIC ENVIRONMENTAL ADVOCATES, LLC

Copies to:

Michael S. Regan, Director, U.S. Environmental Protection Agency:
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
Email: regan.michael@epa.gov

Martha Guzman Aceves, Regional Administrator, U.S. EPA – Region 9:
Sarah Martinez
75 Hawthorne Street
San Francisco, CA, 94105
Email: martinez.sarah@epa.gov

Laurie Kermish Manager, Water Law Section, Office of Regional Counsel
Email: kermish.laurie@epa.gov

Eric Oppenheimer, Executive Director
State Water Resources Control Board:
P.O. Box 100
Sacramento, CA 95812-0100
Email:  eric.oppenheimer@waterboards.ca.gov

Eileen White, Executive Officer for the Water Board SF Bay Region
SF Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612
Email: eileen.white@waterboards.ca.gov

Mayumi Okamoto, State Water Board Office of Enforcement
Email: Mayumi.Okamoto@waterboards.ca.gov

California Water Boards Stormwater Program, stormwater@waterboards.ca.gov



May 13, 2024

<u>Via US Mail, Certified</u>

Lonnie Baptista                              Email: [lon@calcoastinc.com](mailto:lon@calcoastinc.com)
Cal-Coast Mfg
424 South Tegner Road
Turlock, CA 95380

<u>Via US Mail</u>

Lonnie Baptista
Cal-Coast Mfg., Inc.
PO Box 1864
Turlock, CA  95381

Baptista Lonnie L & Shannon West Trs
c/o Baptista 2013 Trust
2301 N Berkley Ave
Turlock, CA 95382-2140

**Re:    60-Day Notice of Violations and Intent to File Suit Under the Federal Water
          Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Cal-Coast Mfg.,
Inc.:

This letter is being sent to you by Pacific Environmental Advocates ("PEA") about
potential non-compliance with the Clean Water Act (CWA) and California's Industrial Stormwater
General Permit ("IGP") at 424 South Tegner Road in Turlock, California operated by Cal-Coast
Manufacturing. It is our understanding that there may be violations that affect water quality and
could potentially harm environmental and public health.

As advocates for environmental protection, one of our primary goals is to ensure
compliance with environmental laws and regulations and to protect our natural resources. We
believe in working collaboratively to address and resolve environmental issues and are committed
to finding a constructive path forward.

---

This letter is being sent to you on behalf of Pacific Environmental Advocates, LLC ("PEA") to give legal notice that PEA intends to file a civil action against Cal-Coast Mfg., Inc. ("Discharger" or "Cal-Coast Mfg") and its corporate officers and other legally responsible parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that PEA believes are occurring at the Cal-Coast Mfg facility located at 424 South Tegner Road in Turlock, California ("the Facility" or "the site").

This letter serves as a formal Notice of Intent to Sue, as required by Section 505(b) of the CWA. This notification is not necessarily a reflection of any initial adversarial intent, but a legal step taken to comply with the procedures laid out in the CWA. A purpose of this notice is to inform you of the alleged violations and to provide an opportunity for you to address the alleged issues.

PEA is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below.  PEA has members throughout California.  Some of PEA's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of PEA's current members has standing to bring suit against Cal-Coast Mfg, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific PEA member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous.  As a result, the interests of certain individual PEA members have been, are being, and will continue to be adversely affected by the failure of Cal-Coast Mfg to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility.  After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, PEA reserves the right to file suit in federal court against Cal-Coast Mfg under

CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.     THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

PEA's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-0028-DWQ) (hereinafter "General Permit").

Information available to PEA, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that Cal-Coast Mfg has to date failed to submit a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit.

As more fully described in Section III, below, PEA alleges that in its operations of the Facility, Cal-Coast Mfg has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.   <u>The Facility</u>

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Cal-Coast Mfg's permanent facility address of 424 South Tegner Road in Turlock, California.

Cal-Coast Mfg is a facility that designs, engineers and manufactures fabricated metal building projects.  Facility operations fall under Standard Industrial Classification Code(s) (SIC) 3448 – Prefabricated metal buildings.  Cal-Coast Mfg's SIC Code(s) and facility operations require it to apply for coverage under the General Permit, pursuant to Attachment A of the General Permit.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 3448, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids, and various types of oil and grease, as well as zinc, nitrates and nitrites as nitrogen (N+N), iron and aluminum.

Information available to PEA indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

## B. <u>The Affected Receiving Waters</u>

The Facility discharges into the City of Turlock municipal storm drain system via facility surface inlets and sheet flow out of the west (front) of the facility (Tegner Road). Stormwater then flows south and west of the facility to the Harding Drain, which has a direct connection to the San Joaquin River ("Receiving Waters"). The San Joaquin River and the Harding Drain are impaired for Boron, Group A Pesticides, Chlorpyrifos, Diazinon, Dieldrin, Dimethoate, Diuron, E.Coli, HCB, gamma-HCH, Malathion, Mercury, Zinphos-mehtyl, alpha-BHC, cis-permethrin, Simazine, Electrical Conductivity, Temperature, DDD, DDE, and DDT.

The San Joaquin River is a water of the United States. The CWA requires that water bodies such as the San Joaquin River meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants. Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

## III.    VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A. <u>Failure to Apply For NPDES Coverage</u>

The CWA prohibits storm water discharges without a permit. 33 U.S.C. § 1342; 40 C.F.R. § 122.26. The General Permit regulates operators of facilities subject to coverage under the National Pollutant Discharge Elimination System (NPDES) storm water permit, as these operators discharge storm water associated with specific industrial activities identified by both

industrial activity and SIC (Standard Industrial Classification) codes in Attachment A of the Permit.

Cal-Coast Mfg's primary industrial activity is listed on Attachment A as an industrial activity subject to NPDES coverage.  Thus, the Facility was required to apply for coverage under the Permit in order to commence business operations, pursuant to Section I.Q of the Permit.

According to California Secretary of State records, Cal-Coast Mfg commenced its operations at the site on or before July 1, 2015 but has failed to date to apply for coverage under the General Permit.

### B. _Failure to Develop and Implement a SWPPP and Site Map_

Cal-Coast Mfg has also failed to develop and implement either a Storm Water Pollution Prevention Plan ("SWPPP") or Site Map for the Facility.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### C. _Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit_

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1. Failure to Conduct Visual Observations

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants.  Dischargers must

document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges.

PEA alleges that Cal-Coast Mfg has failed to conduct the required visual observations since May 1, 2019.

2. <u>Failure to Collect and Analyze the Required Number of Storm Water Samples</u>

In addition, PEA alleges that Cal-Coast Mfg has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

As of the date of this Notice, Cal-Coast Mfg has failed to upload into the SMARTS database system any facility storm water run-off sample analyses.

**D.   _Failure to File Annual Reports_**

Cal-Coast Mfg has failed to comply with Section XVI.A of the General Permit, which provides as follows:  "The Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS."

To date, Cal-Coast Mfg has failed to file Annual Reports for the reporting years 2018-2019, 2019-2020, 2020-2021, 2021-2022 and 2022-2023.

**E.   _Deficient BMP Implementation_**

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.



Figure 1. Metal rusting in yard exposed to stormwater.

PEA alleges that Cal-Coast Mfg has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges. An example is provided in Figure 1 above. Rusting metal is left out in the yard exposed to water. Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Cal-Coast Mfg's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

## F. *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to PEA indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

PEA alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

PEA hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and

distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### G. *Failure to Comply with the Mandates of the Regional Water Board*

Pursuant to Section XIX.B of the General Permit, Regional Water Boards have general authority to enforce the provisions and requirements of the General Permit, including reviewing SWPPPs, Monitoring Implementation Plans, ERA Reports, and Annual Reports and requiring Dischargers to revise and re-submit PRDs, conducting compliance inspections, and taking enforcement actions.

As of the date of this Notice, Cal-Coast Mfg has failed to comply with mandates of the Regional Water Board that it apply for General Permit coverage.

### H. *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

As of the date of this Notice, Cal-Coast Mfg has failed to establish and train a Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Cal-Coast Mfg may have had other violations that can only be fully identified and documented once discovery and investigation have been completed. Hence, to the extent possible, PEA includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

## IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Cal-Coast Mfg., Inc., as well as its corporate officers and employees of the Facility responsible for compliance with the CWA.

## V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is May 1, 2019, to the date of this Notice. PEA may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is Pacific Environmental Advocates, LLC ("PEA").

Darcie Barnes
PACIFIC ENVIRONMENTAL ADVOCATES, LLC
1275 4th Street #4096
Santa Rosa, CA  95404
Telephone: 707-536-1874
Email: solutions@pacificenvironmentaladvocates.com

To ensure proper response to this Notice, all communications should be addressed to PEA's Counsel, Mr. Xhavin Sinha.

Xhavin Sinha
Sinha Law
3901 Lick Mill Boulevard, Suite 356
Santa Clara, CA 95054
Telephone: (408) 791-0432
Email: xsinha@sinha-law.com

## IV.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of <u>$56,460.00 per day, for each violation occurring on or after November 2, 2015</u>.**

In addition to civil penalties, PEA will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to 33 U.S.C. § 1365(d), PEA will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred in this matter.

## V.   CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. PEA encourages Peninsula Plastics Recycling's counsel to contact PEA's counsel within 20 days of receipt of this Notice to initiate a discussion regarding the violations detailed herein and to determine how Peninsula Plastics Recycling may resolve this matter without the necessity of litigation.

During the 60-day notice period, PEA is willing to discuss effective remedies for the violations; however, if Peninsula Plastics Recycling wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If PEA does not receive a response from Peninsula Plastics Recycling or its counsel before the expiration of the 60-day notice period, PEA will consider legal action to ensure compliance. Thank you.

Sincerely,

Darcie Barnes
PACIFIC ENVIRONMENTAL ADVOCATES, LLC

Copies to:

Michael S. Regan, Director, U.S. Environmental Protection Agency:
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
Email: regan.michael@epa.gov

Martha Guzman Aceves, Regional Administrator, U.S. EPA – Region 9:
Sarah Martinez
75 Hawthorne Street
San Francisco, CA, 94105
Email: martinez.sarah@epa.gov

Laurie Kermish Manager, Water Law Section, Office of Regional Counsel
Email: kermish.laurie@epa.gov

Eric Oppenheimer, Executive Director
State Water Resources Control Board:
P.O. Box 100
Sacramento, CA 95812-0100
Email:  eric.oppenheimer@waterboards.ca.gov

Eileen White, Executive Officer for the Water Board SF Bay Region
SF Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612
Email: eileen.white@waterboards.ca.gov

Mayumi Okamoto, State Water Board Office of Enforcement
Email: Mayumi.Okamoto@waterboards.ca.gov

California Water Boards Stormwater Program, stormwater@waterboards.ca.gov

# EXHIBIT B





**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**STATEMENT OF INFORMATION**
**CORPORATION**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| :---: |
| **-FILED-** |
| File No.: BA20240284497 |
| Date Filed: 2/13/2024 |

---

**Entity Details**

| | |
| --- | --- |
| Corporation Name | CAL-COAST MFG., INC. |
| Entity No. | 1013681 |
| Formed In | CALIFORNIA |

**Street Address of Principal Office of Corporation**

| | |
| --- | --- |
| Principal Address | 424 S. TEGNER ROAD<br>TURLOCK, CA 95380 |

**Mailing Address of Corporation**

| | |
| --- | --- |
| Mailing Address | P.O. BOX 1864<br>TURLOCK, CA 95381 |
| Attention | |

**Street Address of California Office of Corporation**

| | |
| --- | --- |
| Street Address of California Office | None |

**Officers**

| Officer Name | Officer Address | Position(s) |
| --- | --- | --- |
| Shannon W. Baptista | P.O. BOX 1864<br>TURLOCK, CA 95381 | Secretary, Chief Financial Officer |
| ▪ Lonnie L. Baptista | P.O. BOX 1864<br>TURLOCK, CA 95381 | Chief Executive Officer |

**Additional Officers**

| Officer Name | Officer Address | Position | Stated Position |
| --- | --- | --- | --- |
| None Entered | | | |

**Directors**

| Director Name | Director Address |
| --- | --- |
| ➕ Lonnie L. Baptista | P.O. BOX 1864<br>TURLOCK, CA 95381 |
| ➕ Shannon W. Baptista | P.O. BOX 1864<br>TURLOCK, CA 95381 |

The number of vacancies on Board of Directors is: 0

**Agent for Service of Process**

| | |
| --- | --- |
| Agent Name | Lonnie L. Baptista |
| Agent Address | 424 S. TEGNER ROAD<br>TURLOCK, CA 95380 |

**Type of Business**

| | |
| --- | --- |
| Type of Business | Construction |

**Email Notifications**

| | |
| --- | --- |
| Opt-in Email Notifications | No, I do NOT want to receive entity notifications via email. I prefer notifications by USPS mail. |

**Labor Judgment**

B2498-1935 02/13/2024 2:03 PM Received by California Secretary of State

No Officer or Director of this Corporation has an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal therefrom is pending, for the violation of any wage order or provision of the Labor Code.

Electronic Signature

☒  By signing, I affirm that the information herein is true and correct and that I am authorized by California law to sign.

*Lonnie L. Baptista*

Signature

*02/13/2024*

Date

B2498-1936  02/13/2024  2:03 PM Received by California Secretary of State